## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **GERLING & ASSOCIATES, INC.,** | **Case No. 2:16-cv-1000** |
| Plaintiff, | **Judge Graham** |
| **v.** | |
| **ODULAIR, LLC,** | **Magistrate Judge Jolson** |
| Defendant. | |

## OPINION & ORDER

Odulair, LLC hired Gerling & Associates, Inc. to design and build a large "mobile medical vehicle" on a truck chassis. Gerling sent Odulair terms of a deal, including technical specifications, drawings, and calculations for the vehicle. The parties exchanged other correspondence. Odulair sent a truck chassis and nearly $150,000 to Gerling, and Gerling started work on the vehicle. Ultimately the deal fell through, Odulair demanded its money back, Gerling sent only half of it back and then sued Odulair, accusing it of stealing Gerling's trade secrets and breaching the parties' contract.

Now, Odulair has filed a motion for judgment on the pleadings, which the Court will **DENY** because Gerling has adequately pleaded all the elements of both a claim for misappropriation of trade secrets and a claim for breach of contract.

### I. Factual Allegations

Gerling alleges that it contracted to design and build a customized truck for Odulair for $295,829.84. This was no ordinary truck; it was a custom-built mobile medical vehicle called a "Gerling Samaritan Series Expanding Side Mobile Exam Facility" specifically built for Clemson University (the "Clemson Truck"). Gerling alleges that the parties came to an agreement regarding the construction of the Clemson Truck "on or about November 12, 2015." (Compl. at ¶ 9). Gerling alleges that a document and the parties' course of conduct indicate they had a contract.

Gerling presents a document entitled, "Gerling Samaritan Series Expanding Side Mobile Exam Facility Sample Configuration Prepared for Odulair, Inc.," as what it calls the "Clemson

Truck Contract." (Answer Ex. A at 2, Doc. 7-1). Gerling alleges that the Clemson Truck Contract required Odulair to deliver a chassis to Gerling on which it would build the truck cab. (Compl. at ¶ 10). All but the cover page and the signature blocks are redacted in the Clemson Truck Contract. (Answer Ex. A at 2, 20). The signature blocks are unsigned. (*Id.* at 20). The signature blocks are dated November 12, 2015. (*Id.* at 20).

Gerling asserts that two sets of documents contain its trade secrets: the Clemson Truck Contract and the Clemson Truck Drawings. Gerling alleges that the Clemson Truck Contract "thoroughly details Gerling's construction methods and materials for manufacturing the Clemson Truck, including part numbers, systems, operations, and design features." (Compl. at ¶ 11). Gerling also sent to Odulair what it refers to as the "Clemson Truck Drawings": technical drawings and specifications for the Clemson Truck that included floor plans, roof plans, and electrical-assembly plans. (*Id.* at ¶¶ 13–14). Gerling alleges that the Clemson Truck Contract contains the following provision: "The above proposal and accompanying information is considered proprietary and may not be reproduced, redistributed, or otherwise disseminated, in part or unabridged, without the expressed written consent of Gerling and Associates, Inc. 2015." (*Id.* at ¶ 12). Gerling alleges that it clearly marked the Clemson Truck Drawings as confidential and proprietary. (*Id.* at ¶ 14).

Odulair doesn't dispute the contents of the Clemson Truck Contract, but it asserts that a different document represents the parties' agreement. Odulair alleges that the contract terms are contained in an email from Gerling dated March 9, 2016. (Answer Ex. C, Doc. 7-3) (hereinafter the "March 9, 2016 Contract"). The letter says, "RE: New Gerling Stallion Medical Truck." (*Id.* at 2). In the letter, Gerling offers a solution to some conditions Odulair placed upon them "so we can move forward with Odulair's second order." (*Id.* at 2). These terms include more favorable payment terms and an agreement not to use images of Odulair projects that display the name "Odulair." (*Id.* at 2). Near the end of the letter, Gerling states, "Please let us know if this is an acceptable proposal and when we may expect the deposit and order for the Clemson project." (*Id.* at 3).

Neither party alleges any written response was made to the March 9, 2016 Contract, but Odulair took two affirmative steps to further the parties' deal. Odulair delivered the chassis for the Clemson Truck "on or around March 30, 2016." (Compl. at ¶ 17). Gerling alleges that "[o]n

or about March 31, 2016, [Odulair] provided a down payment of $147,914.92 (the 'Down Payment') to initiate Gerling's manufacturing work for the Clemson Trailer." (Compl. at ¶ 18).

The parties also engaged in some email correspondence on June 9, 2016. Odulair President Anita Chambers sent an email to Gerling demanding, per the terms of "an agreement," that Gerling remove from its website all references to Odulair units. (Answer Ex. D, at 3–4, Doc. 7-4). Gerling responded by asserting it removed a relevant video from its website but asserted that it did "not find any agreement that references your statements of today." (*Id.* at 3). Odulair responded, attaching a document entitled "Odulair Conditions letter," which Odulair represented was the basis for the Clemson Truck agreement. Specifically, Chambers states, "This is what you and I discussed prior to me deciding to keep the Clemson order with [Gerling]. You did agree, and had Kevin write the letter . . . ." (*Id.* at 2).

Odulair canceled its order on June 28, 2016. (Notice of Removal Ex. A at 11, Doc. 1-1). Gerling issued a receipt and partial refund of Odulair's down payment. Gerling refunded $75,031.95 to Odulair, but Gerling retained $72,882.97 as the cost of labor and materials "per Gerling and Associates, Inc. custom project cancellation policy." (*Id.*). Gerling alleges the following cancellation terms are set forth in the Clemson Truck Contract:

> Upon request of the return of this deposit, the following terms shall govern that transaction: Gerling and Associates, Inc. will return the deposit as paid less the following expenses. The cost of engineering invested in the project to the point of the order cancellation, provided construction has not commenced at a term of net 30 days.

(Compl. at ¶ 22) (emphasis and formatting altered). Gerling asserts that it returned the portion of the deposit due to Odulair and retained what it invested in labor and materials into the cancelled project. Odulair demanded a full refund.

Gerling alleges, "upon information and belief," that Odulair then disclosed the Clemson Truck specifications and plans to a competitor manufacturer. (*Id.* at ¶ 26). Gerling alleges this because "[o]n several occasions Gerling has asked [Odulair] to confirm that the foregoing documentation was provided to a competitor manufacturer but [Odulair] has refused to do so." (*Id.* at ¶ 27).

From these facts, Gerling asserts three claims that are the subject of Odulair's Motion to Dismiss. Count One: Gerling alleges that Odulair violated Ohio's Uniform Trade Secrets Act by using and disclosing to third parties Gerling's trade secrets when Odulair had a duty to maintain the secrecy of that information. (*Id.* at ¶¶ 29–32). Count Two: Gerling alleges that Odulair

breached the terms of the Clemson Truck Contract when it refused to abide by the cancellation terms and then provided Gerling's proprietary information to a competitor. (*Id.* at ¶¶ 33–36). Count Three: Gerling asserts a claim for declaratory relief based on its breach-of-contract claim. (*Id.* at ¶¶ 37–39).

## II. Legal Standard

Odulair moves for judgment on the pleadings as authorized by Federal Rule of Civil Procedure 12(c). Rule 12(c) permits a party to move for judgment on the pleadings, "[a]fter the pleadings are closed--but early enough not to delay trial." Fed. R. Civ. P. 12(c). The legal standards that apply to a motion to dismiss brought under Rule 12(b)(6) apply to a motion for judgment on the pleadings. *See Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 697 (6th Cir. 2005). So when considering a Rule 12(c) motion, the Court "must construe the complaint in a light most favorable to plaintiffs, accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). Plaintiff's allegations, whether direct or inferential, must cover "all the material elements" of the alleged cause of action "to sustain a recovery." *Id.* (quoting *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005)).

A Rule 12(c) or Rule 12(b)(6) motion is based on a plaintiff's failure to meet the requirements for a complaint laid out in Rule 8(a), which requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A short and plain statement of the claim must be something more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 677 (quoting *Twombly*, 550 U.S. at 570). This means that the allegations must "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, but the pleadings need not raise a right to relief to the probable level, *Iqbal*, 556 U.S. at 678 ("The plausibility standard is not akin to a 'probability requirement' . . . .").

## III. Discussion

Because the pleadings show both Gerling's trade-secrets claim and breach-of-contract claim to be more than merely speculative, Gerling sufficiently alleges both. The Court analyzes each in turn.

### A. Gerling Adequately Pleaded that Odulair Misappropriated Gerling's Trade Secrets

Gerling alleges that, without Gerling's consent, Odulair used and disclosed to third parties—it "misappropriated"—Gerling's trade secrets. Gerling gave Odulair information that was either marked as "proprietary" or included in a larger document with a document-wide claim of proprietary status. This triggered Odulair's duty to maintain the secrecy of that information. Odulair disagrees, arguing that Gerling has failed to allege most of the elements of an Ohio trade-secrets claim.

For a misappropriation-of-trade-secrets claim to survive a motion to dismiss, a plaintiff must allege "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (citing *Hoover Transp. Serv., Inc. v. Frye*, 77 F. App'x 776, 782 (6th Cir. 2003) (per curiam)).

### 1. Trade Secrets Exist

What counts as a trade secret? Ohio statute defines a trade secret as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D). In short, a trade secret is information that has economic value from being secret, and its holder must attempt to keep it secret.

The Supreme Court of Ohio analyzes an additional six factors to determine whether information constitutes a trade secret:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e*., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524–25, 687 N.E.2d 661, 672 (1997) (mandamus action where the Supreme Court of Ohio conducted in camera review of some purportedly trade-secret-containing documents and received evidence, including testimony).

Here, Odulair argues that Gerling hasn't sufficiently alleged that a trade secret exists. But accepting as true Gerling's allegations, the Court finds that Gerling has alleged the existence of a trade secret. To qualify as a trade secret, the information must be of the same type as described in the statute, it must derive economic value from not being generally known, and it must be the subject of reasonable efforts to maintain its secrecy.

First, Gerling's Clemson Truck Contract contains designs, specifications, and calculations. This is exactly the type of "technical information" that can constitute a trade secret. *See* Ohio Rev. Code § 1333.61(D).

Second, while proof of the precise economic value of such information seemingly would require expert testimony, it is sufficient at this stage that Gerling has alleged that Odulair sought out and contracted with Gerling to purchase Gerling's custom design and manufacturing services. *See Wellington Res. Grp. LLC v. Beck Energy Corp.*, No. 2:12-CV-104, 2013 WL 5325911, at *6 (S.D. Ohio Sept. 20, 2013) ("[T]he independent economic value of this type of information is apparent from the fact that both Beck and Wellington sought out and contracted with parties in order to provide it."). Gerling has expertise in the design and manufacture of custom vehicles, which means that Gerling has some economic value, not just in its customer service or parts fabrication, but from the proprietary technical information that it uses. In other words, Gerling has some economic value in its trade secrets. And it's plausible that the information in the Clemson Truck Contract led Odulair to select Gerling to manufacture the Clemson Truck. Gerling has sufficiently alleged that the information Gerling provided to Odulair derived economic value from not being generally known.

Third, Gerling subjected the technical information to efforts to maintain its secrecy that were reasonable under the circumstances. It is true that "disclosure to potential or actual customers, absent a confidential agreement or understanding, will destroy any protection of that information as a trade secret." *Thermodyn Corp. v. 3M Co.*, 593 F. Supp. 2d 972, 986 (N.D. Ohio 2008) (citing *R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App. 3d 789, 802, 637 N.E. 2d 332 (1993)). But Gerling alleges that it labelled the Clemson Truck Contract and Drawings as "proprietary" and forbid Odulair from reproducing, redistributing, or disseminating the information without Gerling's express consent. (Compl. at ¶¶ 12–14). Additionally, there is nothing in the pleadings to indicate that Gerling publicly disseminated the designs, calculations, or specifications that were in the Clemson Truck Contract or the Clemson Truck Drawings. While Gerling could have taken more steps to ensure the secrecy of the information in the Clemson Truck Contract and Drawings, it only needed to take steps that were reasonable under the circumstances. Here, when in contract talks with a customer for a custom-designed and quite expensive vehicle, it was reasonable for Gerling to provide some details regarding the vehicle's specifications to Odulair but to label them as proprietary. The technical information at issue here was the subject of reasonable efforts to maintain its secrecy.

To the extent the Court has not already employed the *Plain Dealer* factors, the Court need not and indeed cannot now perform an exhaustive analysis. This analysis requires "a highly fact-specific inquiry," *Thermodyn*, 593 F. Supp. 2d at 986, including factors four through six, the analysis of which requires financial evidence unavailable at the pleadings stage, *see Plain Dealer*, 80 Ohio St. 3d at 524–25. The *Plain Dealer* factors are suited for a summary-judgment analysis. *See Sunkin v. Hunter Eng'g Co.*, No. 5:15-CV-892, 2016 WL 5390408, at *5 (N.D. Ohio Sept. 27, 2016) (using the *Plain Dealer* factors to analyze a trade-secrets claim on a motion for summary judgment). But based on the pleadings, Gerling has alleged that trade secrets existed here.

### 2. The Trade Secrets were Acquired as a Result of a Confidential Relationship

Odulair argues that Gerling has failed to allege a confidential relationship between itself and Odulair.

The Ohio trade-secrets statute doesn't say "confidential relationship." It defines misappropriation to include,

[d]isclosure or use of a trade secret of another without the express or implied con-
sent of the other person by a person who did any of the following: . . . At the time
of disclosure or use, knew or had reason to know that the knowledge of the trade
secret . . . *was acquired under circumstances giving rise to a duty to maintain its
secrecy or limit its use . . . .*

Ohio Rev. Code § 1333.61(B)(2) (emphasis added) (formatting altered). Those "circumstances"
that trigger the trade-secret recipient's duty to maintain their secrecy may include "the holder of
the trade secret reveal[ing] the trade secret to another 'in confidence, and under an implied obli-
gation not to use or disclose it.'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974)
(analyzing Ohio trade-secrets law) (quoting *Cincinnati Bell Foundry Co. v. Dodds*, 10 Ohio Dec.
Reprint 154, 156, 19 Weekly Law Bull. 84 (Super. Ct. 1887)); *see also Power Mktg. Direct, Inc.
v. Ball*, No. 2:03-CV-1004, 2004 WL 5826149, at *7 (S.D. Ohio Apr. 6, 2004) (applying
*Kewanee Oil* analysis to confidential-relationship prong of trade-secrets law). Implied indeed;
"the statute does not require a specific contractual promise on the part of the defendant not to use
or divulge this confidential information." *Ball*, 2004 WL 5826149, at *7; *see also Kuvedina, LLC
v. Cognizant Tech. Sols.*, 946 F. Supp. 2d 749, 756 (S.D. Ohio 2013) (dismissing the defendant's
argument that it had no duty of confidentiality because the parties had no express agreement of
confidentiality).

Gerling alleges no express promise of confidentiality by Odulair but instead relies on its
own notices in the Clemson Truck Contract and Drawings of their proprietary status. Odulair
never signed a nondisclosure agreement, and it didn't sign the Clemson Truck Contract. Odulair
is correct that sometimes an unsigned contract is insufficient to create a confidential relationship.
*See Ball*, 2004 WL 5826149, at *7. But the mere presence of an unsigned contract does not al-
ways relieve the non-signer from keeping a trade secret a secret. In *Ball*, the "lack of consistency
between the allegations in the complaint and the [unsigned] written document weigh in favor of a
finding in this case that the complaint fails to give fair notice to the defendant of exactly what
contract he has violated." *Id.*, 2004 WL 5826149, at *4. That failure on the breach-of-contract
claim proved fatal to the trade-secrets claim. The same inconsistency is not present here, as Odu-
lair does not controvert Gerling's allegations regarding the contents of the Clemson Truck Con-
tract. While the parties dispute which document contains the terms of their agreement, there ap-
pears to be no inconsistency between the allegations and the terms in the documents.

*Bell* is distinct in other ways. In *Ball*, the unsigned licensing agreement was between a
furniture company and one of its licensed dealers. *Id.* at *1. Here, the unsigned agreement is be-

tween a business and its customer. Under these circumstances, the business disclosed its trade secrets to make a sale. *See Releasomers, Inc. v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit, No. C.A. 12535, 1986 WL 13862, at *2 (Nov. 19, 1986) ("[A] confidential relationship may be implied where the facts demonstrate that a trade secret is disclosed in order to promote a particular relationship, e.g., disclosure to a prospective purchaser to enable him to appraise the value of the secret."). Gerling labelled the trade secrets as proprietary and only sent them to Odulair because of their blossoming business relationship.

Finally, in *Ball*, the existence of a confidential relationship depended entirely upon the existence of an agreement to maintain confidentiality; here, the Court finds ample allegations to support the existence of a confidential relationship due to Gerling's express labels on the technical information it sent to Odulair.

In short, the lack of a signature on the Clemson Truck Contract does not relieve Odulair from its duty to maintain the secrecy of the information it received from Gerling during the process of negotiating a contract for the design and manufacture of the custom-designed vehicle it requested. Gerling has sufficiently alleged that the trade secrets in the Clemson Truck Contract and the Clemson Truck Drawings were acquired by Odulair as a result of a confidential relationship.

### 3. Odulair Made Unauthorized Use of the Trade Secrets

Finally, Odulair argues that Gerling failed to allege that Odulair "used or disclosed the trade secrets" at issue because Gerling only pleaded that "upon information and belief," Odulair disclosed the "Clemson Truck Drawings" and "Clemson Truck Calculations" to "third parties." (Def.'s Resp. in Opp'n at 4, Doc. 18; *see* Compl. at ¶ 31).

But the Sixth Circuit permits this style of pleading in some circumstances, like when "a plaintiff may lack personal knowledge of a fact, but ha[s] 'sufficient data to justify interposing an allegation on the subject' or [must] 'rely on information furnished by others.'" *Starkey v. JPMorgan Chase Bank, NA*, 573 F. App'x 444, 447 (6th Cir. 2014) (quoting Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1224 (3d ed. 2012)). Circuits that have done a deep dive on the subject hold that even after *Iqbal* and *Twombly*, plaintiffs may plead facts "'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, *see, e.g., Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008), or where the belief is based on factual information that makes the inference of culpability plausible," *Arista Records, LLC v. Doe 3*, 604

F.3d 110, 120 (2d Cir. 2010) (citing *Iqbal*, 129 S. Ct. at 1949). But Rule 11 looms for the pleader who plays fast and loose with this type of pleading. Rule 11 makes signed pleading the signing attorney's certification that he or she performed "an inquiry reasonable under the circumstances . . . [and] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ." Fed. R. Civ. P. 11(b); *see also* Fed. R. Civ. P. 11(c) (Sanctions for violations of Rule 11(b)).

Here, Gerling alleges a situation where the facts are peculiarly within the possession and control of Odulair *and* where Gerling's belief is based on factual information that makes the inference of culpability plausible. Gerling alleges—upon information and belief—that Odulair provided Gerling's trade secrets to a competitor manufacturer that used Gerling's trade secrets to manufacture the Clemson Truck for Odulair. (Compl. at ¶ 28).

Odulair alleges that it hired another contractor to build the body of the Clemson Truck. (Def.'s Counterclaims at ¶ 50, Doc. 7). What is not clear is whether Odulair provided the Gerling plans to the substitute manufacturer. But, it's at least plausible that Odulair used some of Gerling's information to outline its desired product to the substitute manufacturer. Odulair alleges that it had to hire another contractor sometime after March 31, 2016 to attempt to meet a June/July 2016 deadline for the Clemson Truck. (Def.'s Counterclaims at ¶¶ 49–50). It's plausible from these pleadings that Odulair hired a manufacturer that could build the Clemson Truck quickly. A short timeframe makes it more plausible that Odulair didn't start the process from scratch with the substitute manufacturer.

Odulair argues that it is just as plausible that it used independently developed materials to build the truck. First, Odulair argues it didn't "approve Gerling's technical drawings and specifications for the Clemson Truck," which indicates its dissatisfaction with Gerling's design, (Compl. at ¶ 19), and makes Odulair's unauthorized use of the Gerling trade secrets less plausible. But Odulair's failure to approve the drawings and specifications indicates negligence as much as it does dissatisfaction. Either is plausible. And while Odulair could have developed and used its own plans, specifications, and calculations for the Clemson Truck, it's at least plausible that it instead used the information it received from Gerling.

It's plausible that Odulair made unauthorized use of Gerling's trade secrets, which is the third element of a misappropriation-of-trade-secrets claim. Since all three elements have been adequately pleaded, Odulair's motion to dismiss Gerling's trade-secrets claim is denied.

**B. Gerling Adequately Pleaded a Breach-of-Contract Claim**

Gerling also brings a claim for breach of contract, alleging that it performed all of its obligations under the Clemson Truck Contract, Odulair breached the contract by cancelling it, refusing to abide by its terms, and disseminating Gerling's trade secrets to a competitor without Gerling's consent, and Odulair's breach caused damage to Gerling. (Compl. at ¶¶ 34–36). Odulair argues that the parties didn't sign the Clemson Truck Contract, but they did agree to a contract months later, the terms of which are spelled out in the March 9, 2016 Contract. (*See* Answer Ex. C, Doc. 7-3). Odulair argues that Gerling can't state a claim for breach of an "express, written contract" because the parties never had an express, written contract—they never agreed upon and signed any contract. (Def.'s Mot. J. Pleadings at 6, Doc. 15).

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 F. App'x 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012)). A contract exists when some essential elements are present: "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Minster Farmers Coop. Exchange Co. v. Meyer*, 117 Ohio St. 3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 28 (2008) (quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976)). "The burden of establishing a contract rests upon the party who asserts existence of the agreement." *Advance Sign Grp., LLC v. Optec Displays, Inc.*, 722 F.3d 778, 784 (6th Cir. 2013).

Here, the critical issue is whether there was a manifestation of mutual assent, or a meeting of the minds as to the essential terms of the contract (these terms are used interchangeably in Ohio case law). *Id.*; *see also Minster Farmers* at ¶ 28. This is not always easy to discern, but here are some rules that apply. "[A] contract may be validly entered into even though the written instrument evidencing the terms of the contract has not been executed by the parties." 17 Ohio Jur. 3d Contracts § 72 (citing *Hamilton Foundry & Mach. Co. v. Int'l Molders & Foundry Workers Union of N. Am.*, 193 F.2d 209, 213–14 (6th Cir. 1951)). But in cases where neither party signs an agreement, the offeree had no bargaining power to change the agreement, and the parties had no history of prior dealings, the written instrument is not a valid contract. *Robertson v. Rossing*, 12th Dist. Butler, No. CA98-02-035, 1999 WL 59698, at *2 (Feb. 8, 1999). The parties may

manifest mutual assent when each party makes a promise or begins to render performance. *Advance Sign Grp.*, 722 F.3d at 784 (citing *Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App. 3d 477, 2011-Ohio-3822, 960 N.E.2d 1005, ¶ 14 (10th Dist.)). Parties may manifest their assent "wholly or partly by written or spoken words, or by other acts or the failure to act." *Costner Consulting* at ¶ 14 (quoting *Precision Concepts Corp. v. Gen. Emp't & Triad Pers. Servs., Inc.*, 10th Dist. Franklin, No. 00AP-43, 2000 WL 1015114, at *2 (July 25, 2000)).

Gerling alleges that the parties' contract is the Clemson Truck Contract. While the Court doesn't know the terms of the Clemson Truck Contract, other than the Cancellation Terms, which Gerling copied into its Complaint, (*see* Compl. at ¶ 22), Gerling argues that Odulair's conduct indicates it agreed to the terms of the Clemson Truck Contract. Conversely, Odulair alleges that the promises in the March 9, 2016 Contract and oral promises from Gerling induced Odulair to hire Gerling as the contractor. (Answer at ¶34).

Here, the pleadings show a murky picture regarding the parties' operative contract. Neither party signed either "contract," but both instruments appear to outline terms by which the parties abided. The alleged course of conduct between the parties indicates they had prior dealings and took steps to complete the Clemson Truck: Odulair sent money and the truck chassis; Gerling prepared the drawings, schematics, and technical specifications in the Clemson Truck Contract and Drawings and incurred significant costs in doing so.

The most damaging pleading for Odulair is this: that the Clemson Truck Contract required Odulair to provide the chassis for which Gerling would custom manufacture the vehicle, and Odulair did deliver the chassis to Gerling. (Compl. at ¶¶ 10, 17). If this happened, it's plausible that Odulair assented to the terms of the Clemson Truck Contract. *See Costner Consulting*, 195 Ohio App. 3d 477, 2011-Ohio-3822, 960 N.E.2d 1005 at ¶ 14. On the other hand, Gerling appears to have accepted Odulair's deposit based on the payment schedule outline in the March 9, 2016 Contract. With these pleadings, the Court won't dismiss Gerling's claim for breach of contract.

Relatedly, Odulair argues that Gerling's only breach-of-contract claim is "for breach of an express, written contract," and since no document is signed, Gerling can't state a claim for breach of contract. (Def.'s Mot. J. Pleadings at 6). True, Gerling doesn't set out a separate cause of action for breach of an implied contract. But in Ohio, there are three types of contracts that can be breached: express, implied in fact, and implied in law. *Fouty v. Ohio Dept. of Youth*

*Servs.*, 167 Ohio App. 3d 508, 2006-Ohio-2957, 855 N.E.2d 909, ¶ 56 (10th Dist.). Here, the claim at issue is for breach of contract, and Gerling's pleading was sufficient to put Odulair on notice that the Clemson Truck Contract and the conduct of the parties could be at issue. Further proving the point is the fact that Odulair brings a counterclaim based on what it says is the rightful contract: the March 7, 2016 Contract. So, the notice pleading plausibility standard of Rule 8 is satisfied here. *See Ramsey v. Allstate Ins. Co.*, 416 F. App'x 516, 521 (6th Cir. 2011) (holding that plaintiff need not specifically plead "a cause of action based on an implied contract [when] the complaint appears to sufficiently set forth the basis for and the facts underlying such a claim."). Perhaps Gerling or Odulair will prove that their preferred document is the governing express contract between the parties; however, there's also the possibility that the parties have an implied-in-fact contract the terms of which draw from both documents and the parties' actions.

While it's possible that Odulair will show that it didn't intend to be bound by the Clemson Truck Contract, it's at least plausible that it did manifest its assent. Therefore, Gerling has adequately pleaded a breach-of-contract claim.

### C. Gerling Adequately Pleaded a Declaratory Judgment Claim

Gerling also brings a claim for a declaratory judgment based on its breach-of-contract claim. Having held that Gerling adequately pleaded its breach-of-contract claim, Gerling's declaratory-judgment claim likewise survives Odulair's Motion for Judgment on the Pleadings. Neither party presents any independent legal analysis of the declaratory-judgment claim.

## IV. Conclusion

Odulair's Motion for Judgment on the Pleadings is **DENIED**. (Doc. 15).

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: June 28, 2017